## ACCOUNTS OF.

[Note. Cases cited under this title will be found arranged in alphabetical order under the names of the commissioners, etc.; e. g. "Accounts of the Shipping Com'r. See Shipping Com'r of Port of New York, Case No. 12,792."]

## ACHILLES, The, (McCLOSKEY v.)

[See McCloskey v. The Achilles, Case No. 8,701.]

## ACHSAH, The, (ORR v.)

[See Orr v. The Achsah, Case No. 10,586.]

## ACKER, (MARTIN v.)

[See Martin v. Acker, Case No. 9,155.]

## Case No. 26.

### ACKER v. The RAINBOW.

[4 Amer. Law J. (N. S.) 332; 14 Law Rep. 450.]

District Court, S. D. New York. Oct. 11, 1851.

## ACKERLY v. VILAS.

[See Akerly v. Vilas, Case No. 119.]

## ACKERMAN, The C. F.

[See The C. F. Ackerman, Case No. 2,562.]

## Case No. 27.

### The ACME.

[2 Ben. 386;[1] 7 Int. Rev. Rec. 149; 1 Amer. Law T. Rep. U. S. Cts. 60.]

District Court, E. D. New York. April, 1868.[2]

MARITIME LIENS—PRIORITIES—ADVANCES— FRAUDULENT NATIONALITY.

1. Where a libel was filed against a vessel to recover advances made in a foreign port, on the request of her master, for the purpose of paying off a bottomry bond, and on the return of the process no owner appeared for her, but a mortgagee appeared, and, on his consent, the vessel was sold under a venditioni exponas, and the proceeds paid into court, and thereupon the mortgagee filed a claim and answer, not only joining issue with the allegations of the libel, but setting up his claim as mortgagee, and praying that his claim be paid out of the proceeds, which were insufficient to satisfy both claims.

2. And where, on the proofs, it appeared that the vessel, though nominally a British vessel and owned by a British subject, was really the property of American citizens residing in New York, who thus sailed her under false colors, and with a fraudulent nationality, and, while they were so using her, agreed with the respondent for a loan of the security on their personal obligation and a mortgage on the vessel, to be executed by the fictitious owner, and the latter accordingly executed to the respondent the mortgage under which alone he claimed the proceeds: Held, That the proceeding had been made one to effect the proper distribution of the proceeds of a vessel, already condemned and sold at the suit of the libellant, and it was, therefore, subject to the considerations which control courts of admiralty in the distribution of money in the registry.

[Cited in The Hermine, Case No. 6,409.]

3. Before the English admiralty, the claim of the mortgagee would be rejected as founded on a sham title, created in violation of law.

[Cited in The Hermine, Case No. 6,409.]

4. On principles of comity, it is the duty of this court to apply the same rule.

[Cited in The Hermine, Case No. 6,409.]

5. The transaction in question was contrary to public policy, and is not to be upheld under our own laws.

---

[1][Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2][Affirmed by circuit court in The Acme, Case No. 28.]

6. The claim of the mortgagee, therefore, must be rejected, and as the facts were sufficient to sustain the libellant's claim against the fund, his claim, therefore, must be paid.

In admiralty. This was originally an ordinary suit in rem, brought to recover of the bark Acme the amount of certain advances made by the firm of M. A. Herrera & Co., of Havana. In the first instance, the libellants filed their libel against the vessel, upon which process was issued, under which the vessel was taken into custody by the marshal. Upon the return of the process, no owner appeared to defend, and default was entered against all persons, except George H. Millington, of Manchester, England, but residing in New York, who appeared by his proctor, and obtained time to file a claim and answer as mortgagee of the vessel. No stipulation for value was, however, given, but, on the contrary, by the consent of the mortgagee, upon the motion of the libellants, a venditioni exponas was then issued in the cause, directing the marshal to sell the vessel, and pay the proceeds into the registry, to abide the further order of the court. The vessel was accordingly sold, and thereupon Millington filed a claim, averring that he was entitled to the proceeds; and, on the same day, he also filed a pleading, designated as a claim and answer, in which he not only joined issue upon the averments of the libel of Herrera, but also set up his own claim to the proceeds as based upon an outstanding mortgage upon the vessel; insisting that by virtue of such mortgage he had a lien upon the vessel superior and prior to the claim of Herrera, and praying not only that the claim of Herrera be rejected, but also that his own claim be paid out of the proceeds of the vessel now in court. The facts in relation to Millington's mortgage were shown to be as follows. The bark Acme was built in Baltimore, Md., in 1855. At some time thereafter she was transferred—whether nominally or not did not appear—to one John Patterson, described as "of Inverness, Scotland, but now residing in the city of Brooklyn, state of New York." In January, 1866, she, by purchase, became the property of persons residing and doing business in New York, who were not British subjects, and who, in the absence of other proof, the court held must be presumed to be American citizens. These persons, in order to avoid the navigation laws, and to retain for the vessel the British flag, to which, as the property of American citizens, she was no longer legally entitled, caused the title of the vessel to be placed in the name of one Henry James Creighton, described as "of Halifax, Nova Scotia, but now residing in the city of New York," and who had, in fact, no interest in the vessel, nor any possession thereof; and thereafter, although in reality owned and possessed by American citizens, controlled by them alone, and used for their sole benefit, the vessel, up to her seizure by the marshal, sailed under false colors, with a fraudulent nationality. While so sailing, the present respondent agreed with the real American owners of the vessel to loan to them the sum of $12,000 on the security of their personal obligation, and a mortgage upon the vessel, to be executed by the fictitious owner, and, accordingly, in accordance with the forms of the British laws, Creighton then, without interest in or possession of the vessel, executed a mortgage upon her to secure the amount so loaned by Millington, which mortgage was received by Millington with the knowledge that the mortgagor did not own the vessel, but simply held the title for the purpose of giving to her a false nationality. Millington never had taken any possession of the vessel.

The proceeds of the vessel were not sufficient for the payment of the libellant's claim and the respondent's mortgage in full. [Decree for libellants. Affirmed in The Acme, Case No. 28.]

C. Donohue and Benedict & Benedict, for libellants.

C. M. Da Costa, for respondents.

BENEDICT, District Judge. The mode of procedure here adopted has made this, in effect, the ordinary case of a controversy between two competing claimants of a fund in court. The position of the respondent before the court is not that of an ordinary claimant of a vessel, who prays no affirmative relief, and simply asks the release of his vessel from custody. Here the vessel has, by the consent of the respondent, been sold upon the demand of the libellants, by the order of the court, and by his claim and answer the respondent requires the court to determine at the same time the respective rights and priorities of these two competing claimants to the fund. I see no objections to this method of procedure, when consented to by a claimant. It gives to the claimant the advantage of protecting himself by the purchase of the vessel, and, at the same time, sheltering the proceeds, by means of the default entered in behalf of the libellants, from any other liens which may be outstanding; but, at the same time, it transforms the proceedings from an action against a vessel looking toward her condemnation and sale, to a proceeding to effect a proper distribution of the proceeds of a vessel already condemned and sold at the suit of the first libellant. As such, they are subject to the considerations which control courts of admiralty in the distribution of money in the registry. There is, then, before the court a fund insufficient to satisfy the two demands which are now presented and the court is called upon to determine the validity and priority of each of these demands as against the other. On the part of the mort-

gagee, while it is not denied that the libellants, Herrera & Co., made the advances for which they sue. and that they were made to relieve the necessities of the vessel in a foreign port, it is contended that the evidence shows that the advance was made upon the personal credit of the owners exclusively, and that, accordingly, no lien was created upon the vessel; which being the case, the fund, it is insisted, should be distributed in satisfaction of the mortgagee's claim. On the other hand, the libellants, Herrera & Co., insist that the credit of the vessel was relied on when they made their advances, and that they then acquired a valid lien upon the vessel under the maritime law, which entitled them to payment out of the fund, or, if it be considered that upon the evidence no lien was created, which could have been enforced against the vessel herself, still, they insist that in a proceeding to distribute a fund in the registry, the court must regard equity, and award the fund to them, for the reason that their advances were in fact for the benefit of the mortgagee, having been made to pay off a bottomry bond. which, if not thus paid, would have absorbed the whole vessel to the exclusion of the mortgage. And lastly, it is contended that the claim of the respondent rests upon an illegal title, made under circumstances which require the court to disregard it, as founded upon a transaction prohibited by law and contrary to public policy.[3]

The transaction disclosed by the evidence. as it regards the title and character of this vessel, was a clear fraud upon the navigation laws of the nation whose flag was thus assumed. By the law of England, the use of the British flag and national character upon vessels owned by other than British subjects, is unlawful, and subjects the vessel to forfeiture. Were this case, then, before the English admiralty, the claim of the mortgagee would be rejected as founded upon a sham title, created in violation of law; and the question is presented, whether it is not the duty of this court to apply the same rule. In determining this question, it should be remarked that it is raised in a court of admiralty, and courts of admiralty are in some sense international courts, charged with the duty of declaring the law applicable to ships and in force upon the sea, which, being the common highway of the nations, requires harmonious rules and laws recognized as such by all. These courts are often impelled to take notice of the rules and regulations which are applied in admiralty courts of other nations. They sometimes even enforce the decrees of such courts. They are courts before which the principles of comity may be invoked with pe-

culiar propriety, and where those principles should be applied with increasing liberality, as year by year the nations are drawn closer to each other by the ties of commerce and of trade. And the nature of the transaction in question, and the effect which such transactions, if upheld, must have upon the mode of use of that most peculiar species of property, the ships, seem to require of a court of admiralty in a case like this to accord effect to the laws of England, in contravention of which the title to this vessel was held. For this is not the case of the assumption of a neutral flag in time of war to cover property as against an enemy, nor yet is it a case of the violation of a revenue law of a foreign nation. The law of England violated in this case has no relation to the revenue. its only object is to prevent the privileges and protections, afforded to the property of British subjects in ships, from being claimed by vessels not entitled thereto. And it is a law which can well be noticed, and, on proper occasions, enforced by the courts of other nations, for the reason that the aid of those courts is necessary to its efficacy, inasmuch as the ship may never visit the ports of the nation whose flag she has fraudulently assumed. Indeed, being owned and controlled elsewhere, it is to be presumed that she will not visit ports where forfeiture awaits her.

Furthermore, the United States have an interest in enforcing this law as well as England, for it is of importance to all maritime powers that the national character borne by a ship should be her true character. And the offence is one which may be perpetrated against every maritime power by citizens of every other such power, and in regard to which the United States may at any time be placed in a position to desire reciprocity of decision for their own protection.

Such being the character of the transaction in question, and the proceeding here being one in regard to a fund, brought into the registry by the consent of the respondent, and the other facts of the case being such that substantial justice, as between the only claimants of the fund, will thus be rather promoted than otherwise, I am of the opinion that it is the duty of this court, upon principles of comity, in this case to apply the rule which would be applied in the English admiralty, and refuse to recognize a claim to the fund, based upon a sham title, created in fraud of the navigation laws of England, for the purpose of giving to this ship a false nationality.

Of this conclusion the respondent can the less complain, because his mortgage, upon which not only his claim upon the fund, but his standing in court, depends, is drawn in the form prescribed by the merchants' shipping act of England. It contains no word of conveyance other than the word "mortgage," nor any power of possession or sale.

---

[3] [The opinion, as reported in 7 Int. Rev. Rec. 149, contains at this place a statement of the evidence relating to the title and nationality of the vessel, which in this report is included in the statement preceding the opinion, ante.]

but expressly refers to the merchants' shipping act as the source of the rights intended to be conferred by it. It is a statutory mortgage, apparently dependent for its efficacy upon a statutory power of sale. The respondent, then, invoking the laws of England in support of his claim, cannot well object to the application of any portion of those laws to his demand.

But the transaction here disclosed, and upon which the claim of the respondent rests, may well be considered, in a case like the present, as contrary to public policy, and so not to be upheld under our own laws. If it be not by any statute made a crime against the United States to assume and use a false nationality for a ship owned by American citizens (and I cannot find that it is), still such an act is clearly contrary to the spirit and policy of the registry and navigation laws of the United States. These laws have for their object the encouragement of American navigation and American shipbuilding, to the exclusion of foreign navigation and foreign ownership. And they everywhere look to the disclosure by citizens of the United States, owning in ships, of their ownership therein. To permit an evasion of the duties thus imposed through the device of a nominal title held by a foreigner resident here, would afford plain encouragement to disregard the law. The transaction, moreover, is not without features of fraud upon the public. For the ship is a common carrier, supposed by the public to have and be entitled to the national character which she bears; but, bearing a false flag, she may involve innocent shippers, passengers, or seamen, in difficult and complicated questions, which may be precipitated upon them at any time in foreign ports or at home; as, for instance, in regard to the liability to search, the jurisdiction of the consul of the nation whose flag has been falsely assumed, the rights and remedies of the seamen, and the jurisdiction of our courts in relation thereto, the applicability of the limited liability acts, and acts for preventing collisions, and other similar questions. And lastly, by reason of the peculiarity of property in ships and the legal formalities and restrictions imposed upon its use by our laws, a fictitious title, like the one in question, makes necessary false reports by the master at the custom house, by means of which officers of the revenue may be misled. It has the effect to conceal property which the law intends should be disclosed, and may thus operate as a fraud against creditors. It requires false declarations from the nominal owner and others, as in the present case, where the mortgagor acknowledged himself indebted to the respondent in the considerable sum of $12,000, when, in fact, he owed him nothing, and declared himself to be the owner of the vessel, when he had no possession or ownership thereof, nor any sort of interest therein, as both he and the mortgagor then knew. It is a sham, created to avoid disabilities imposed by law, which places all parties connected therewith in a false relation toward the government, the community, and each other, and should, therefore, in a case like the present, be held to be against the policy of the law, and insufficient as a basis of a claim upon the fund, as against the other claimant thereof. Upon these considerations, and without expressing any opinion upon the other questions argued before me, I reject the claim of the mortgagee. There being, then, no other claim to the fund, except that of the libellant, the conceded facts are sufficient to support it, and the fund will be distributed in satisfaction thereof, so far as it may be sufficient therefor.